[Cite as *State v. Young*, 2018-Ohio-488.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105511**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## KENNETH D. YOUNG

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-600431-B

**BEFORE:** McCormack, J., E.A. Gallagher, A.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** February 8, 2018

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Jonathan Block
Mary M. Frey
Assistant County Prosecutors
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

{¶1} Defendant-appellant Kenneth D. Young appeals from his conviction for gambling in violation of Ohio's gaming statute. For the reasons that follow, we affirm the conviction.

Procedural History

{¶2} On November 12, 2015, Young was charged with six counts of gambling in violation of R.C. 3772.99(E)(5) in Counts 9 through 14 and eight counts of gambling in violation of R.C. 3772.99(E)(7) in Counts 15 through 22, along with a codefendant, Lonnie L. Bridges, who was charged with five counts of gambling in violation of R.C. 3772.99(E)(5) in Counts 1 through 5 and three counts of gambling in violation of R.C. 3772.99(E)(7) in Counts 6 through 8. Both Young and Bridges rejected the state's offer of a plea, as a "packaged deal," and the matter was scheduled for trial.

{¶3} Prior to trial, both defendants moved to dismiss the indictment, stating that the statutes at issue are unconstitutionally vague as applied to the defendants' dice sliding. Defendants contended that the statutes violate due process because they fail to provide sufficient warning of the proscribed conduct, i.e. they fail to define a proper "roll." The court denied the defendants' motions to dismiss, and the matter proceeded to a jury trial.

{¶4} At the close of the evidence, the defendants moved for Crim.R. 29 dismissal, which the court denied. At this time, the defendants renewed their motion to dismiss based upon the constitutionality of the statute, which the court also denied.

**{¶5}** The jury then returned a guilty verdict as to both Young and Bridges on all respective counts. The court determined the counts do not merge, and it sentenced Young to five years community control. The court found the defendants jointly and severally liable to the casino for restitution in the amount of $39,342. Young and Bridges filed respective appeals.

Evidence at Trial

**{¶6}** On July 25, 2015, Young, Bridges, and a third unidentified male companion entered the Horseshoe Casino in Cleveland, Ohio, and gambled at the craps table designated as number 502. While gambling at table 502, the three men cumulatively won over $39,000, including $18,465 on their final roll. Jennifer Trnavsky, the table supervisor at the time, became suspicious of the dice rolls being thrown by the men because the rolls appeared to be too low to the table and "didn't have any air under them." After Bridges threw the final winning roll, Trnavsky alerted her supervisor and casino surveillance because she was concerned the men might be sliding the dice. The three men left the table immediately after the payout. Trnavsky testified that the men left the table in the middle of a roll, which was unusual because "whoever was shooting the dice was shooting well."

**{¶7}** The actions of Young, Bridges, and their unidentified compatriot were brought to the attention of Agent Jason Slarb from the Ohio Casino Control Commission, a state regulatory authority that oversees the operation of the casinos in Ohio. Agent

Slarb is a state law enforcement officer who is posted inside the casino and investigates alleged gaming-related crimes.

{¶8} Slarb described the technique of "sliding dice" as preemptively setting the dice to the number on which you want them to come to a stop and then throwing them in a manner such that they only spin horizontally, with the desired number on top throughout the entire roll. Executed correctly, the die does not rotate vertically or "tumble" but rather lands on the craps table and spins or "slides" to a stop with the desired number showing. This technique requires skill, and when executed successfully, the individual throwing the dice is able to spin the dice such that they result in the desired numbers for the thrower to win his wager.

{¶9} Sliding the dice, even when the thrower is only partially successful in that one die spins and the other tumbles, drastically alters the element of chance in the game of craps because certain outcomes are eliminated and the odds of the desired outcome being produced are increased. When the thrower is completely successful in that he is able to spin both dice simultaneously, the thrower will have assured himself a winning wager through his manipulation of the dice. The walls of the craps table operate to force dice to tumble, and a correct roll is required to strike the walls to ensure unpredictability. However, the testimony at trial established that table operators rarely call a "no roll" when the thrower fails to strike the walls. A dice slider aims for the dice to come to a stop short of the wall so as to ensure that the spun die does not tumble as a result of striking the wall. Even when a dice slider is only partially successful in that only one of

the two dice slides as intended, other gamblers at the table can be harmed in that certain dice outcomes upon which they have wagered are rendered unobtainable.

{¶10} Slarb presented surveillance video of 26 different throws executed by Young, Bridges, and their compatriot at table 502. Of the 26 throws presented to the jury, six of the throws appear to represent legitimate throws where the dice tumbled and/or intentionally struck the walls of the craps table, generating a truly random result. Agent Slarb testified that it was a common practice for dice sliders to mix legitimate throws into their pattern to mask their sliding attempts.

{¶11} The remaining 20 throws were attempted slides of the dice with varying success. Of those 20 throws, Young threw six times, Bridges threw four times, and their compatriot threw ten times. Slarb testified that the three men were all constantly betting together based on each other's rolls at the table. The relevant bets were placed on specific outcomes such as "hard sixes" or "hard eights," which required the dice outcome to be double threes or double fours, respectively. Michael DePinto, a game shift manager at the casino, also testified that in his review of the surveillance footage, the men would only place such bets when one of the three of them was rolling the dice as opposed to when an unaffiliated gambler at the table was rolling. In each of the 20 throws, the surveillance video reflected, at a minimum, an attempt to slide one or both of the dice on a number consistent with the specific wagers the men had placed on the table.

{¶12} Agent Slarb testified that physical positioning of a player at the craps table is an important component to dice sliding. The ideal dice sliding location at the table is

directly to the left of the "stick person" because the stick person is responsible for watching the roll of the dice. When positioned directly to the stick person's left, the thrower is able to shorten the length of the table that the dice must travel, reducing the time for the stick person to view the dice. The surveillance video revealed that Young, Bridges, and their compatriot repeatedly exchanged positions with one another to ensure that whichever of the three was throwing, that person would always throw from the ideal dice-sliding position.

{¶13} In addition to showing the sliding rather than tumbling of the dice across the table, the surveillance footage also reflected the three men repeatedly and meticulously preparing the dice for their intended throw. When the stick man would use the stick to drag the dice to one of the men for them to pick up and throw, the thrower would routinely pick out a die that was already pre-positioned with the desired number showing or manipulate the dice on the table with his hand until they turned to such number. Only then would the thrower pick up the dice and begin his attempt to slide. Barry Ledbetter, a surveillance supervisor at the casino, testified that this type of manipulation changes the outcome, "the whole mathematics of the game."

{¶14} Finally, Agent Slarb and Horseshoe casino personnel detailed distractionary techniques employed by the three men to occupy the attention of the table's dealers during the throws and to minimize the opportunity of the dealers to view the sliding of the dice. These techniques included throwing in late wagers with chips and unnecessarily forcing the dealers to conduct cash transactions during rolls despite the ready availability

of chips.   The men also gave the dealers tips in the form of bets placed on their rolls, which Agent Slarb identified as a technique used when a dice slider is concerned he might be detected and wants the dealer to ignore his sliding.

{¶15} Ledbetter testified that the three men operated as a dice-sliding "team." The team works together to distract the dealer, the stick person, and the box person at the table.   Ledbetter explained how the three men worked together simultaneously — positioning themselves advantageously, manipulating the dice to show a certain number, and making late buy-ins with cash — to create confusion at the table in order to successfully slide the dice.

## Assignments of Error

I.   The trial court erred by denying appellant's motion to dismiss because the statutes resulting in appellant's charges and convictions are unconstitutional.

II.   Appellant's constitutional rights to due process and notice were violated by a lack of specificity in the indictment because it charged him with multiple, similar offenses over a period of time without sufficient differentiation among the counts of misconduct and appellant's convictions were the result of plain error or the ineffective assistance of counsel.

III.   The court erred by denying appellant's motion in limine to exclude irrelevant and other acts evidence, by admitting irrelevant and other acts evidence over appellant's objection.

IV.   Appellant was denied a fair trial where an in-court identification was impermissibly suggestive.

V.   Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motion for acquittal.

VI.   The convictions were against the manifest weight of the evidence.

VII.	The trial court erred by ordering restitution without determining the amount that was actually owed.

VIII.	The trial court erred by failing to merge all allied offenses of similar import and by imposing separate sentences for allied offenses which violated appellant's state and federal rights to due process and protections against double jeopardy.

Constitutionality of R.C. 3772.99

**{¶16}** In his first assignment of error, Young challenges the constitutionality of Ohio's gaming statute. Specifically, Young contends that R.C. 3772.99(E)(5) and 3772.99(E)(7) are unconstitutionally vague.

**{¶17}** A statute is unconstitutionally vague if the statute "'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" *Solon v. Bergen*, 8th Dist. Cuyahoga No. 80594, 2002-Ohio-7224, quoting *State v. Dorso*, 4 Ohio St.3d 60, 446 N.E.2d 449 (1983), quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Under the vagueness doctrine, statutes that do not fairly inform a person of the conduct that is prohibited violate one's due process rights. *State v. Carrick*, 131 Ohio St.3d 340, 2012-Ohio-608, 965 N.E.2d 264, ¶ 14; *State v. Reeder*, 18 Ohio St.3d 25, 26, 479 N.E.2d 280 (1985); *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). The test is "'whether the language conveys sufficiently definite warning as to the proscribed conduct

when measured by common understanding and practices.'" *Reeder*, quoting *Jordan v. De George*, 341 U.S. 223, 231-232, 71 S.Ct. 703, 95 L.Ed. 886 (1951).

{¶18} In Ohio, a statute is presumed constitutional. *State v. Anderson*, 57 Ohio St.3d 168, 171, 566 N.E.2d 1224 (1991). The party challenging a statute therefore bears the burden of proving that the statute is unconstitutional beyond a reasonable doubt. *Id.*

{¶19} Young argues that R.C. 3772.99(E)(5) and 3772.99(E)(7) are unconstitutionally vague because they fail to notify a reasonable person that dice sliding constitutes criminal conduct. In support, Young provides that dice sliding is not defined in the statute, nor do the casino's internal control standards specifically prohibit dice sliding.

{¶20} R.C. 3772.99(E) provides as follows:

(E) A person who purposely or knowingly does any of the following commits a felony of the fifth degree on a first offense and a felony of the fourth degree for a subsequent offense. * * *

* * *

(5) Places, increases, or decreases a wager on the outcome of a casino game after acquiring knowledge that is not available to all players and concerns the outcome of the casino game that is the subject of the wager;

* * *

(7) Claims, collects, takes, or attempts to claim, collect, or take money or anything of value in or from a casino game with the intent to defraud or without having made a wager contingent on winning a casino game * * *.

**{¶21}** There is no Ohio case law that addresses the constitutionality of R.C. 3772.99(E) as it applies to dice sliding or any other games typically played at Ohio casinos. However, the state, in its response, directs our attention to a Nevada Supreme Court case, *Skipper v. State*, 110 Nev. 1031, 879 P.2d 732 (1994), in which the court found Nevada's gaming statute was constitutionally certain as applied to the act of dice sliding. We find the decision in *Skipper* instructive.

**{¶22}** In *Skipper*, surveillance video showed the defendant throwing dice in a manner referred to as dice sliding while playing craps at two casinos. The dice slider was convicted of cheating at gaming in violation of Nevada's gaming statutes, Nev.Rev.Stat. 465.070(7) and 465.083. Skipper challenged his conviction, arguing that the statutes are unconstitutionally vague because they fail to alert the average dice player that dice sliding constitutes a criminal act. *Id.*

**{¶23}** Nev.Rev.Stat. 465.070(7), entitled "Fraudulent Acts," makes it unlawful "[t]o manipulate, with the intent to cheat, any component of a gaming device in a manner contrary to the designed and normal operational purpose for the component, * * * with knowledge that the manipulation affects the outcome of the game or with knowledge of any event that affects the outcome of the game." Nev.Rev.Stat. 465.083 makes it unlawful to "cheat" at any gambling game. Nevada's gaming statute defined "cheating" as "[altering] the elements of chance, method of selection or criteria," which determine either "the result of a game" or "the amount or frequency of payment in a game." Nev.Rev.Stat. 465.015.

**{¶24}** The Nevada Supreme Court stated that dice sliding uses

a methodology of play that is based upon a purposefully orchestrated combination of factors designed to change the nature of play through affirmative acts of cheating and deception. For example, * * * [the defendant utilizes] an accomplice to obscure the dealer's vision of the table while [the defendant] purposely engage[s] in sliding the dice.

*Skipper* at 1035. The court explained:

The game of craps understandably involves players who throw the dice in accordance with the rules of play. The rules of play require the "roll" of the dice, thus resulting in the dice either tumbling or bouncing off the end of the table as a result of the player's throw. * * * [C]raps dealers are trained to call a "no roll" unless the dice are thrown in the manner described. Thus, players who may accidently slide the dice simply have their play nullified by the dealer's call. [The defendant], however, sought to prevent the dealer from detecting and invalidating his method of play by utilizing a confederate to obscure the dealer's vision. In effect, [the defendant] was blindfolding the dealer while placing the dice on the table in a winning combination.

*Id.*

**{¶25}** Thus, the court concluded that "[t]his method of altering the elements of chance clearly constitutes cheating" and "[i]nnocent players would not engage in this type of deceptive, manipulated play." *Id.* The court further concluded that where a skilled dice slider, such as the defendant, who "surreptitiously and contrary to the rules of the

game, alters the probable outcome of a throw and drastically increases the chances of winning certain types of bets on the craps table" is cheating, because this type of play alters the elements of chance. *Id.*

{¶26} In finding the defendant guilty of cheating as defined by Nevada's gaming statute, the court distinguished the defendant's dice sliding from "handle popping," whereby a gambler simply utilizes a method of handle-pulling on slot machines to achieve the best advantage the slot machine mechanics will provide. Where a "handle popper" does not alter the physical characteristics of the game (i.e. slot machine) or violate any established rule of play, a dice slider, on the other hand, "deceitfully alter[s] an integral attribute of the game in affecting the otherwise established probabilities of its various outcomes." *Id.*, citing *Lyons v. State*, 105 Nev. 317, 775 P.2d 219, 222 (1989) (finding the use of confederates and other devices to purposefully alter the criteria that determines the outcome of a game to be proscribed by statute); *see also Sheriff of Washoe Cty. v. Martin*, 99 Nev. 336, 662 P.2d 634 (1983) (finding that a player who deceitfully alters the attributes of a game with the intent to deprive another of money or property "by affecting the otherwise established probabilities of the game's various outcomes," the player is guilty of cheating in violation of Nevada's gaming statute).

{¶27} Finally, in upholding the defendant's conviction, the Nevada Supreme Court did not find Nevada's gaming statute unconstitutionally vague as applied to dice sliding. "[P]ersons of average intelligence who play the game of craps * * * will have no difficulty understanding that a surreptitious manipulation of the dice contrary to the rules

of the game, in order to alter its outcome, constitutes an act of cheating * * * and * * * [is] proscribed as a criminal act * * *." *Skipper,* 110 Nev. 1031, 879 P.2d at 734-735.

{¶28} Here, like in *Skipper*, Young was convicted of violating the state's gambling statute for his conduct known as "dice sliding." Although Young was not convicted of "cheating," like the defendant in *Skipper*, the statutes contain similar language, and we find the Nevada Supreme Court's reasoning likewise applies here.

{¶29} In upholding the defendant's conviction in *Skipper*, the Nevada Supreme Court reasoned that the defendant's conduct, which included sliding dice and using "confederates" to obscure the dealer's view and prevent the dealer from detecting the defendant's manipulation of the dice, violated its gambling statute because the conduct was a purposeful and deceitful manipulation of a key attribute of the game that was effectuated in order to alter the elements of chance or affect the outcome of the game. That court also found that the statute was not vague because the average person would understand that manipulation of the dice in order to affect the outcome of the game constituted cheating.

{¶30} Similarly, Ohio's gambling statute proscribes conduct that includes making a wager "after acquiring knowledge that is not available to all players and concerns the outcome of the casino game" and "claim[ing], collect[ing], tak[ing], or attempt[ing] to claim, collect, or take money" from a casino game with the "intent to defraud." Just as in *Skipper*, Young, Bridges, and their compatriot manipulated the dice and used each other as distractions to the dealers in order to alter the outcome of the game.

Unbeknownst to other players at table 502, Young, Bridges, and the third person had knowingly and purposefully manipulated the dice in such a manner that the other players' chances at winning were either greatly decreased or eliminated entirely. When Young was not attempting to manipulate the dice himself, he was placing bets on his compatriots' rolls in an attempt to benefit from their dice sliding. The evidence shows that Young would only bet on certain outcomes, such as "hard eights" and "hard sixes," and he would only place his bets when one of the three men was rolling the dice, because he knew in advance what outcome the men were attempting to achieve by sliding the dice.

{¶31} We, too, find that a person of average intelligence who plays the game of craps would have no difficulty understanding that such action — dice sliding and using distractions to avoid being caught — is "acquiring knowledge that is not available to all players and concerns the outcome of the casino game" and placing wagers on a predetermined roll is "claim[ing], collect[ing], tak[ing], or attempt[ing] to claim, collect, or take money" in a casino game with the "intent to defraud." We therefore do not find R.C. 3772.99(E)(5) and 3772.99(E)(7) unconstitutionally vague as applied to Young's conduct.

Specificity in the Indictment

{¶32} Young's second assignment of error challenges the specificity of the indictment. Young was charged in the indictment with six counts of gambling in violation of R.C. 3772.99(E)(5) and eight counts of gambling in violation of R.C. 3772.99(E)(7). He contends that because the indictment charged him with multiple,

similar offenses over a period of time without sufficient differentiation of the counts, his constitutional rights to due process and notice were violated. Young argues that his conviction as a result of the unspecified indictment was plain error. In the alternative, he argues ineffective assistance of counsel for the failure to object to the form of the indictment.

{¶33} Young's trial counsel did not object to the form of the indictment. Ordinarily, when the defense attorney fails to object to the form of the indictment prior to trial as required by Crim.R. 12(C), the party has waived all but plain error. *See State v. Yaacov*, 8th Dist. Cuyahoga No. 86674, 2006-Ohio-5321, ¶ 13. To prove plain error, Young must demonstrate the existence of an error that is obvious on the record and, but for that error, the outcome of trial would have been different. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61. Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978).

{¶34} In some respect, the plain error standard differs from the ineffective assistance of counsel standard. *State v. Seeley*, 7th Dist. Columbiana No. 2001 CO 27, 2002-Ohio-1545, ¶ 38; *State v. Murphy*, 91 Ohio St.3d 516, 559, 747 N.E.2d 765 (2001) (Cook, J., concurring). A defendant's claim that his counsel was ineffective for failing to object eliminates the requirement that an objection be made in order to preserve an

error for appeal. *State v. Carpenter*, 116 Ohio App.3d 615, 621, 688 N.E.2d 1090 (2d Dist.1996).

**{¶35}** However, like the plain error analysis, an ineffective assistance of counsel claim also requires a showing of prejudice. *See State v. Locke*, 8th Dist. Cuyahoga No. 102371, 2015-Ohio-3349, ¶ 21. In order to establish a claim of ineffective assistance of counsel, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶36}** Therefore, under either analysis, Young must demonstrate that had the counts contained in the indictment been differentiated, the outcome of his trial would have been different.

**{¶37}** The United States Supreme Court outlined the criteria by which the sufficiency of an indictment is to be evaluated under the Due Process Clause:

> These criteria are, first, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and, secondly, "'in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' *Cochran and Sayre v. United States*, 157 U.S. 286, 290; *Rosen*

*v. United States*, 161 U.S. 29, 34."  *Hagner v. United States*, 285 U.S. 427, 431.

*Russell v. United States*, 369 U.S. 749, 763-764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *State v. Schwarzman*, 8th Dist. Cuyahoga No. 100337, 2014-Ohio-2393, ¶ 7.  Following *Russell*, the Sixth Circuit Court of Appeals stated that "an indictment is only sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy."  *Valentine v. Konteh*, 395 F.3d 626, 631 (C.A. 6, 2005).

{¶38} Similarly, the Ohio Supreme Court has held that "[a]n indictment meets constitutional requirements if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *State v. Childs*, 88 Ohio St.3d 558, 564-565, 728 N.E.2d 379 (2000), quoting *Hamling v. United States*, 418 U.S. 87, 117-118, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

{¶39} Additionally, under Crim.R. 7(B), an indictment is sufficient if it "contains a statement that the defendant has committed a public offense" and the statement may be "in ordinary and concise language" and in the words of the applicable section of the statute, "provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged."  Crim.R. 7(B); *Schwarzman*; *see also Hamling*.

**{¶40}** Young argues that the multiple, undifferentiated charges in the indictment violated his rights to notice and double jeopardy. In support, he cites to the Sixth Circuit Court of Appeals decision in *Valentine*.

**{¶41}** In *Valentine*, the defendant was charged with 20 counts of rape and 20 counts of felonious sexual penetration of a child occurring in the ten-month span between March 1995 and January 1996. Valentine argued that the lack of differentiation among the charges prejudiced his ability to offer alibi defenses. The Sixth Circuit agreed, finding that within each set of 20 counts, "there are absolutely no distinctions made." *Id.*, 395 F.3d at 632. The court stated that "if a defendant is going to be charged with multiple counts of the same crime, there must be some minimal differentiation between the counts at some point in the proceeding." *Id.* at 638. The Sixth Circuit determined that outside of the victim's estimate of abuse, the state presented no evidence as to the specific number of incidents, and because the 40 total counts "were not anchored to forty distinguishable criminal offenses, Valentine had little ability to defend himself." *Id.* at 633. The court acknowledged, however, that "due process problems in the indictment might have been cured" had the prosecution delineated the factual bases for the 40 separate incidents either before or during the trial. *Id.* at 634.

**{¶42}** We note, initially, that *Valentine* has no binding effect on this court. *State v. Burnett*, 93 Ohio St.3d 419, 423-424, 755 N.E.2d 857 (2001) (although oftentimes persuasive, Ohio appellate courts are not bound by lower federal court opinions); *Schwarzman*, 8th Dist. Cuyahoga No. 100337, 2014-Ohio-2393, at ¶ 11. Moreover, the

*Valentine* decision "has been criticized for applying law that does not apply to Ohio grand juries, misapplying and misrepresenting case authority, and being 'distinguished in every subsequent Sixth Circuit decision that cites it on this issue.'" *Schwarzman*, quoting *State v. Billman*, 7th Dist. Monroe Nos. 12 MO 3 and 12 MO 5, 2013-Ohio-5774, ¶ 34.

**{¶43}** Regardless of *Valentine's* applicability, this court has cited *Valentine* and reached the same conclusion regarding the need to differentiate multiple counts of an indictment either through a bill of particulars or at trial. *See, e.g.*, *State v. Apanovitch*, 2016-Ohio-2831, 64 N.E.3d 429, ¶ 61 (8th Dist.) (finding no differentiation in the indictment, the bill of particulars, the jury instructions, and neither the state's opening or closing statements); *State v. Barrett*, 8th Dist. Cuyahoga No. 89918, 2008-Ohio-2370, ¶ 27 (finding the trial court erred in dismissing the indictment "without first affording the state the opportunity to link the charges to the differentiated incidents either before or during trial"); *Yaacov*, 8th Dist. Cuyahoga No. 86674, 2006-Ohio-5321, at ¶ 21 (finding sufficient differentiation among the counts based on the victim's ability to recall when, where, and how the abuse occurred); *State v. Cunningham*, 8th Dist. Cuyahoga No. 89043, 2008-Ohio-803, ¶ 38 (distinguishing *Valentine* because the state presented evidence at trial to differentiate each of the five counts for which defendant was convicted).

**{¶44}** Here, the indictment contains identical counts of gambling in violation of R.C. 3772.99(E)(5) as well as R.C. 3772.99(E)(7). This case is distinguishable from *Valentine*, however, because the evidence presented at trial, through Agent Slarb's

testimony and the video of Young's gameplay at the craps table, provided sufficient differentiation among the counts. Slarb presented 20 distinct video surveillance clips of 20 different throws that were executed either by Young, Bridges, or the third unidentified male who were working in tandem to slide dice at table 502. Each video represents a violation of R.C. 3772.99(E)(5) and/or 3772.99(E)(7), depending on who was throwing the dice. Slarb identified the specific conduct in each of the videos that demonstrated how the three men, working together, either attempt to slide dice, successfully slide dice, or act to distract the dealer by throwing cash on the table for a late buy-in. Six of these video clips show Young attempting to slide the dice. And all of the videos show Young, Bridges, and/or their compatriot placing bets only when one of the three men was rolling the dice, as well as attempting to collect, or collecting, their winnings, which was dependent upon the success of the dice slide.

{¶45} Because we find the evidence presented sufficiently differentiated the counts contained in Young's indictment, we find no error. Young's second assignment of error is therefore overruled.

## Other Acts Evidence

{¶46} In his third assignment of error, Young contends the trial court erred by allowing the state to introduce the testimony of Andrew Ford. Ford was a surveillance supervisor for the French Lick Casino in Indiana in 2008. Ford testified that on January 7, 2008, a stick person alerted surveillance to a patron, later identified as Young, who was attempting to slide the dice at the craps table. Ford explained that he observed Young place a bet on "hard eights" along with a "hopping hard eight" bet and set the dice on the number four before throwing the dice. Ford also explained that instead of rolling the dice in the air, Young "would twist them and slide [the dice] across the table forward to turn, but not roll, and stay on the same number, and they would come up short of the wall." Ford testified that he observed this conduct approximately four times. Ford stated that the shooter was always placing bets on the "hard eight," which was a 9 to 1 wager, as well as the "hot eight," which is a 30 to 1 wager, and he would place a $25 "dealer tote bet" that the dealer gets if the shooter wins. Ford also testified that the rules of craps are the same in every state. Young argues that this evidence was offered solely to prove that he acted in conformity with his past conduct in attempting to cheat at a casino.

{¶47} Young also contends that the court erred in allowing the testimony of Thomas Miller, a gaming agent for the Ohio Casino Control Commission. Miller testified concerning Bridges's attempted dice slide on a craps table at the Hollywood

Columbus Casino in Columbus in 2014. Young argues that he was prejudiced by evidence that related solely to his codefendant, Bridges.

{¶48} Evid.R. 404(B), "other acts," provides that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Such evidence may, however, be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

{¶49} Similarly, R.C. 2945.59, which provides certain exceptions to the common law regarding the admission of evidence of other acts of wrongdoing, provides that

[i]n any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

*State v. Terry*, 2014-Ohio-4804, 23 N.E.3d 188, ¶ 64 (8th Dist.).

{¶50} In determining whether other-acts evidence is to be admitted, trial courts conduct a three-step analysis: (1) determine if the other-acts evidence is relevant under Evid.R. 401; (2) consider whether evidence of the other crimes, wrongs, or acts is

presented to prove the character of the accused in order to show activity in conformity therewith, or whether the other-acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B); and (3) consider whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice. *State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583, ¶ 32, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

**{¶51}** The admission of other acts evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb such evidentiary decisions in the absence of an abuse of discretion that created material prejudice. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

**{¶52}** Here, we find no error in the admission of either the testimony of Ford or Miller. The state introduced evidence of Ford's testimony for a relevant and legitimate purpose under Evid.R. 404(B) — to establish Young's knowledge of how to play the game of craps and to demonstrate the absence of mistake in Young's conduct at the craps table. Secondly, the trial court mitigated any potential prejudice by providing a limiting jury instruction concerning the testimony of both witnesses. *See Williams* at ¶ 23, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Prior to Ford's testimony, the trial court advised the jury that some evidence is admitted for limited purposes and should not be considered to prove the character of the defendant or that he acted in conformity with that character; rather, that evidence can only be considered for the purposes of deciding whether it proves the absence of a mistake, knowledge, or the

defendant's motive or intent. The trial court also specifically instructed the jury to consider Ford's testimony only as it applies to Young, if at all, and to consider Miller's testimony only as it applies to Bridges if at all. We presume the jury follows a trial judge's curative instructions. *Williams*.

{¶53} However, even if the record could be construed to constitute a violation of Evid.R. 404(B), we find any error in the admission of Ford's and Miller's testimony to be harmless pursuant to Crim.R. 52(A). *State v. Mims*, 8th Dist. Cuyahoga No. 100520, 2014-Ohio-5338, ¶ 60; *State v. Bell*, 8th Dist. Cuyahoga No. 97123, 2012-Ohio-2624, ¶ 59. The intent and execution of Young's scheme to covertly alter the odds of the game of craps in his favor and against both the casino and other patrons at the table was unmistakable from the surveillance footage presented at trial. The introduction of Ford's and Miller's testimony was therefore harmless error at best.

{¶54} Young's third assignment of error is overruled.

### In-Court Identification

{¶55} In his fourth assignment of error, Young contends that he was denied a fair trial when the court allowed an impermissibly suggestive in-court identification. In support, Young cites to *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶56} In *Biggers*, the United States Supreme Court held that an identification derived from an unnecessarily suggestive procedure, which has a likelihood of leading to a misidentification, violates a defendant's right to due process. *Id*. To determine the

admissibility of challenged identification testimony, courts apply a two-prong test: (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and, if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive nature. *State v. Jones*, 8th Dist. Cuyahoga No. 102318, 2015-Ohio-4694, ¶ 49.

**{¶57}** Young's reliance upon *Biggers*, however, is misplaced. Here, the state presented the live Skype testimony of Andrew Ford, from the French Lick Casino in Indiana. As discussed in the previous assignment of error, Ford testified concerning Young's conduct at the Indiana casino in 2008 relating to Young's knowledge of the game of craps. We found no error in the trial court permitting Ford's testimony under Evid.R. 404(B). Ford's testimony was admitted for the sole purpose of demonstrating that Young knew how to play craps and to demonstrate absence of mistake in Young's conduct at the craps table.

**{¶58}** In the course of this testimony, Ford explained how the casino identified Young through a facial recognition program as the player at the craps table "doing short rolls." Ford stated that the casino used this program to match faces in a database of people who have cheated at casinos previously. Ford testified that through the use of the facial recognition program, he connected the face in the surveillance video of the Indiana casino on January 7, 2008, to the name "Kenneth Deshawn Young." When asked if he could identify Young, Ford replied that he could. Because Ford's testifying via Skype presented certain technical challenges concerning Ford's ability to see who was in the

courtroom, the court directed the defendants to stand in front of the screen, where Ford could see them. Ford immediately identified Young, in the courtroom, as the individual at the Indiana casino in 2008.

{¶59} This identification, however, serves to support Ford's testimony under Evid.R. 404(B) and confirm that the defendant, Young, was in fact, the person Ford knew from the Indiana casino (or that Ford knew what Young looked like). Ford's identification of Young was not offered for the purpose of identifying Young as the individual sliding dice at the Horseshoe Casino in Cleveland on July 25, 2015.

{¶60} Moreover, Young has failed to demonstrate how he was prejudiced by the allegedly suggestive identification. Upon entering the Horseshoe Casino in July 2015, Young presented his driver's license for identification purposes to casino security. Agent Slarb testified that this identification was placed on a "podium camera" and he was therefore able to identify Young through casino surveillance. Agent Slarb also identified Young in the courtroom as one of the three men sliding dice at table 502.

{¶61} We therefore find the trial court did not err in permitting the Evid.R. 404(B) identification.

{¶62} Young's fourth assignment of error is overruled.

### Sufficiency and Manifest Weight of the Evidence

{¶63} In his fifth and sixth assignments of error, Young contends that his convictions were not supported by sufficient evidence and his convictions were against the manifest weight of the evidence.

{¶64} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶65} While the test for sufficiency of the evidence requires a determination whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins* at 390. Also unlike a challenge to the sufficiency of the evidence, a manifest weight challenge raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new

trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A finding that a conviction was supported by the manifest weight of the evidence, however, necessarily includes a finding of sufficiency. *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 14, citing *Thompkins* at 388.

{¶66} Although the reviewing court considers the credibility of witnesses in a challenge to the manifest weight of the evidence, it does so "with the caveat that the trier of fact is in the best position to determine a witness' credibility through its observation of his or her demeanor, gestures, and voice inflections." *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶ 39. "'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 56, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

{¶67} A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶68} Young argues that the state failed to present sufficient evidence of his convictions of gambling in violation of R.C. 3772.99(E)(5) and (7) because (1) Agent Slarb was the only witness to testify regarding the alleged incidents and he improperly told the jurors what they were seeing; and (2) casino personnel lacked knowledge of dice sliding, did not recognize his throws as sliding, and were not trained on how to properly address dice sliding. He also argues the fact that he and Bridges provided identification upon entering the casino, when it is not required, demonstrates a lack of intent to defraud the casino.

{¶69} As previously discussed, R.C. 3772.99(E) prohibits an individual from placing a wager "on the outcome of a casino game after acquiring knowledge that is not available to all players and concerns the outcome of the casino game that is the subject of the wager" and "claim[ing], collect[ing], tak[ing], or attempt[ing] to collect" money from a casino game "with the intent to defraud." R.C. 3772.99(E)(5) and (7).

{¶70} The state presented the testimony of Agent Slarb, who explained Young's conduct, along with the conduct of Young's companions, at the craps table. The video surveillance identified 20 of the 26 rolls at table 502 as attempts to slide or successful slides. Slarb testified that even if only one of the dice tumbles, and the other dice remains fixed to the number set by the slider, the attempt is still a violation because it greatly decreases, or eliminates entirely, the chances of others betting at the table who do not have the advanced knowledge of the fixed number.

{¶71} The video clips depict the three men alternately presetting one or both dice to a fixed number — either a three or a four — before releasing them in a manner that ensured that one or both of the dice would spin, or slide, across the table, rather than tumble, and remain fixed on that particular number. Slarb testified that the slide was evidenced by the lack of shadow under the dice. Jennifer Trnavsky testified that there was no "air" under the dice. Six of these video clips show Young attempting to slide the dice. As explained by Slarb, all of the videos show Young, Bridges, and/or their compatriot placing bets only when one of the three men was rolling the dice, as well as attempting to collect, or collecting, their winnings (which was dependent upon the success of the dice slide) on these mutually beneficial rolls. The evidence also demonstrated that the three men repeatedly exchanged positions with one another to ensure that whichever of the three was throwing, that person would always throw from the ideal dice sliding position, which was to the left of the stick person. Slarb also testified that the men consistently worked together, with one of the men attempting the slide while the other men used distractionary tactics to confuse the dealer or distract his or her attention from the slider's manipulation of the dice, especially through late cash buy-ins.

{¶72} Although it is true that casino personnel failed to detect the trio's dice sliding until codefendant Bridges's final roll when they won $18,465 and the table supervisor, Jennifer Trnavsky, alerted surveillance, the fact that Young and his companions were skilled at manipulating the dice and hiding their manipulation of the

dice does not undermine the sufficiency of the evidence presented by the state. The dice sliding in this case is very difficult to detect with the naked eye in real time, which is evidenced by the casino employees' failure to do so. However, with the benefit of frame-by-frame analysis of the surveillance footage, the dice sliding efforts of the three men become very obvious. Repeatedly, Young and his companions can be seen loading up bets on a very specific outcome of the dice — often double threes — and only when one of them is throwing the dice. A hindsight review of the surveillance footage leaves no ambiguity in what the men were attempting to, and did, in fact, accomplish. And Slarb's description of the activity occurring at table 502 was necessary and proper.

{¶73} Young's argument that he and Bridges provided identification upon entering the casino is evidence that they had no intention to defraud the casino is without merit. The surveillance supervisor testified that the casino requests identification of any individual entering the casino who appear to be under 30 years of age. It is likely that casino security requested identification from Young, and Young had no say in the matter.

{¶74} In light of the foregoing, we find the state provided sufficient evidence to support Young's convictions for placing a wager on the outcome of a casino game after acquiring knowledge that is not available to all players that concerns the outcome of the game and his convictions for claiming, collecting, or attempting to claim or collect money from a casino game with the intent to defraud. And for the reasons outlined above, we also find the conviction is not against the manifest weight of the evidence. The purposeful attempt to surreptitiously alter the element of chance in the craps game in

favor of Young and his companions, whether by manipulating the dice or participating in the scheme by distracting the dealers and placing wagers, was easily discernible from the surveillance video. The jury did not lose its way in convicting Young.

{¶75} Young's fifth and sixth assignments of error are overruled.

Restitution

{¶76} Young challenges the court's order of restitution in his seventh assignment of error. He contends that the court erred by ordering restitution that was not supported by the record.

{¶77} We note, initially, that Young failed to object to the order of restitution or the amount of restitution ordered at sentencing. He therefore waived all but plain error. *State v. Jarrett*, 8th Dist. Cuyahoga No. 90404, 2008-Ohio-4868, ¶ 14, citing *State v. Marbury*, 104 Ohio App.3d 179, 181, 661 N.E.2d 271 (8th Dist.1995).

{¶78} Under R.C. 2929.18, a victim has the right to restitution for economic loss suffered as a direct and proximate result of the commission of the offense. If the court imposes restitution, it may base the amount of restitution on estimates or amounts recommended by the victim; however, the restitution ordered must be based on the victim's economic loss and may not exceed the amount of the actual economic loss. R.C. 2929.18(A)(1).

{¶79} Generally, we review an order of restitution for an abuse of discretion. *State v. Welch*, 8th Dist. Cuyahoga No. 105158, 2017-Ohio-7887, ¶ 19. "'There must be competent and credible evidence in the record from which the court may ascertain the

amount of restitution to a reasonable degree of certainty.'" *Welch*, quoting *State v. Seele*, 6th Dist. Sandusky No. S-13-025, 2014-Ohio-1455, ¶ 9. Before imposing restitution upon a defendant, a trial court must engage in a "due process ascertainment that the amount of restitution bears a reasonable relationship to the loss suffered." *State v. McLaurin*, 8th Dist. Cuyahoga No. 103068, 2016-Ohio-933, ¶ 13, citing *State v. Borders*, 12th Dist. Clermont No. CA2004-12-101, 2005-Ohio-4339.

**{¶80}** A trial court has no obligation "to itemize or otherwise explain how it arrived at the amount of restitution it orders," so long as the trial court can ascertain the amount of restitution to a reasonable degree of certainty from competent, credible evidence in the record. *Welch* at ¶ 22, citing *State v. Perkins*, 3d Dist. Marion No. 9-13-52, 2014-Ohio-2242, ¶ 23; *State v. Didion*, 173 Ohio App.3d 130, 2007-Ohio-4494, 877 N.E.2d 725, ¶ 20 (3d Dist.).

**{¶81}** Here, Michael Depinto, game shift manager for the casino, testified at the restitution hearing on behalf of the casino. Depinto testified that the casino's surveillance team conducted an in-depth review of the video footage of the night of July 25, 2015. The team reviewed each individual roll at the craps table from the three individuals allegedly involved in the dice-sliding operation to determine the exact amount of monetary loss to the casino, and the director of surveillance determined the total amount of loss to the casino resulting from all of the rolls combined was $39,342. Depinto testified that this amount included the payouts for all three individuals who were under surveillance for dice sliding on the evening of July 25. Depinto explained that

because the three men worked together, the losses from all of the men were combined. Moreover, during the trial, Depinto testified that he, along with the surveillance team, reviewed the surveillance footage of the dice sliding and the attempted slides and they determined that during the final six rolls alone the payout was $35,022.

{¶82} Upon review, we find no abuse of discretion. The court's order of restitution, jointly and severally, in the amount of $39,342 was supported by competent, credible evidence in the record.

{¶83} Young's seventh assignment of error is overruled.

Allied Offenses

{¶84} In his final assignment of error, Young contends that the court erred in failing to merge his convictions. Young claims that his convictions were part of a single course of conduct with a single animus.

{¶85} R.C. 2941.25, the allied offenses statute, codifies the constitutional right against double jeopardy, thus prohibiting multiple punishments for the same offense. *State v. Robinson*, 8th Dist. Cuyahoga No. 99917, 2014-Ohio-2973, ¶ 53, citing *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. The statute provides when multiple punishments can and cannot be imposed:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of

the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25; *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 12.

{¶86} In *Ruff*, the Ohio Supreme Court explained that when a defendant's conduct constitutes a single offense, the defendant may only be convicted and sentenced for that offense. *Id.* at ¶ 24. However, when the conduct "supports more than one offense, the court must determine whether the offenses merge or whether the defendant may be convicted of separate offenses." *Id.*

{¶87} To make this determination, the trial court must necessarily consider the defendant's conduct, specifically considering "how were the offenses committed." *Id.* at ¶ 25. In making this determination, the court must evaluate the defendant's conduct, his or her animus, and the import of the offenses:

> As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?

*Id.* at ¶ 31. If the answer is "yes" to any of the above, the defendant may be convicted of all of the offenses separately. *Id.*

**{¶88}** The court in *Ruff* continued to explain that

[w]hen a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense.

*Id.* at ¶ 26; *State v. Black*, 2016-Ohio-383, 58 N.E.3d 561, ¶ 12 (8th Dist.).

**{¶89}** Here, the evidence showed three men working together to manipulate their odds of winning at the craps table. Each roll, or attempt to slide dice, was a separate and distinct act wherein the three men took on different roles, either actively sliding the dice or acting as distractions, or placing their own wagers in attempts to benefit from their companions' covert action. The rolls included different wagers resulting in different outcomes or payoffs. The fact that the rolls of the dice occurred in quick succession does not compel the conclusion that the rolls were a single course of conduct with a single animus. *See State v. Blanchard*, 8th Dist. Cuyahoga No. 90935, 2009-Ohio-1357, ¶ 12, *rev'd on other grounds*, *State v. Williams*, 130 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108 ("[T]he mere fact that the crimes occurred in quick succession * * * does not mean that they were not committed separately or with separate animus.").

**{¶90}** Additionally, each roll of the dice affected not only the casino but each individual player placing bets at the craps table. Each time one of the dice-sliding trio

covertly manipulated the dice, he altered the element of chance, thereby decreasing or eliminating the possibility of winning for those players who unknowingly placed wagers on the game with a predetermined outcome. Thus, each slide or attempted slide victimized new or different players placing wagers at table 502.

{¶91} We therefore find the trial court did not err when it did not merge Young's convictions.

{¶92} Young's final assignment of error is overruled.

{¶93} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

_____
TIM McCORMACK, JUDGE

EILEEN A. GALLAGHER, A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR